IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 22-cv-01817-PAB-NRN

STEVEN B. SILVERSTEIN,

      Plaintiff,

v.

JEFFREY A. WOLF,
JEAN WOLF,
KIVA LLC,
WHEATLEY IRREVOCABLE TRUST,
MESHAKAI WOLF,
RAPID PARK HOLDING CORP,
PATUSH, LLC,
183 WEST ALAMEDA, LLC,
MADISON FAMILY ENTERPRISES, LLC,
JOSHUA REY,
EVERGREEN FAMILY IRREVOCABLE TRUST, AND
FOUNDATION FOR ARTS CULTURE & EDUCATION LTD.,

      Defendants.

---

**ORDER**

---

This matter comes before the Court on plaintiff's Motion to Enjoin Transfers of Stock, to Levy Execution of Proceeds of Stock, and for Appointment of Receiver over Stock [Docket No. 181]. The Court has jurisdiction pursuant to 28 U.S.C. § 1332.

**I. BACKGROUND**

Plaintiff Steven Silverstein registered a judgment against defendants Jeffrey Wolf, Jean Wolf, JTG Ventures, LLC, and ORD Ltd. in the District of Colorado on January 21, 2022. *Silverstein v. Wolf*, No. 22-rj-00001-PAB-NRN, Docket No. 1. Mr. Silverstein filed the present action on July 22, 2022. Docket No. 1. Mr. Silverstein has

named a number of defendants in this action, *see* Docket No. 125 at 1, but, for the purposes of this order, the defendants discussed will be Jeffrey Wolf and Madison Family Enterprises, LLC ("Madison").  Although the order refers to arguments made by Mr. Wolf, those arguments were also made on behalf of Madison, Jean Wolf, Kiva, LLC, Wheatley Irrevocable Trust, Patush, LLC, 183 West Alameda, LLC, Evergreen Family Irrevocable Trust, and Foundation for Arts Culture & Education, Ltd.

On June 21, 2023, Mr. Silverstein filed a motion seeking a preliminary injunction, levy of execution, or receivership prohibiting the transfer of Mr. Wolf's stock in Rapid Park Holding Corp. ("Rapid Park").  Docket No. 72.  On July 28, 2023, the Court denied that motion, finding that the then-operative complaint failed to state any causes of action upon which the Court could grant injunctive relief.  Docket No. 113 at 6-8.

Mr. Silverstein filed an amended complaint on August 18, 2023, alleging claims under the Colorado Uniform Fraudulent Transfer Act ("CUFTA").  Docket No. 125 at 12, 17, 20, 23, 25-27.  On September 18, 2024, Mr. Silverstein filed the present motion, again seeking an injunction, a levy of execution, or a receivership over Rapid Park stock controlled by Mr. Wolf.  Docket No. 181.  On August 19, 2025, the Court held an evidentiary hearing on the motion.  Docket No. 247.

## II.  FINDINGS OF FACT[1]

### A. The Oklahoma Litigation

Mr. Silverstein testified that he and Mr. Wolf have known each other since the mid-1980s.  They went into business together involving real estate in Tulsa, Oklahoma.  A dispute arose between the two of them in 2012.  Litigation regarding that dispute

---

[1] In this section, the Court references only testimony that it found to be credible, unless otherwise noted, and exhibits admitted during the August 19, 2025 hearing.

began two years later in the District Court for Tulsa County, Oklahoma.  On October 13, 2020, the Tulsa district court granted summary judgment, on the issue of liability only, to Mr. Silverstein on his claims against Mr. Wolf.  Exhibit 1 at 1; Docket No. 238-1 at 1.  On November 6, 2020, the Tulsa court appointed a receiver over the condominiums that were the subject of the underlying dispute.  Exhibit 3 at 2; Docket No. 238-3 at 2.

On October 4, 2021, the Tulsa court held a jury trial to resolve the issue of damages.  Exhibit 1 at 2; Docket No. 238-1 at 2.  The jury returned a verdict in favor of Mr. Silverstein and against Mr. Wolf in the amount of $1,200,000 for breach of contract and $10,000 for fraud, fraudulent transfer, and tortious interference with contract. Exhibit 1 at 2; Docket No. 238-1 at 2.[2]  The receiver eventually sold the condominiums. Over objection from Mr. Wolf, Mr. Silverstein received approximately $600,000 from the proceeds of the sale as partial payment towards the judgment.

On February 15, 2022, in District of Colorado case number 22-rj-00001-PAB-NRN, Mr. Wolf, appearing pro se, filed a pleading stating that there was no outstanding judgment against him and that Mr. Silverstein and his attorney were lying.  Exhibit 4 at 1; Docket No. 238-4 at 1.  At the August 19 hearing, Mr. Wolf testified that, when he filed the February 2022 pleading, he did not remember the October 2021 verdict.

Mr. Wolf appealed the Tulsa judgment to the Oklahoma Court of Appeals, which affirmed the judgment on August 15, 2025.  Docket No. 242-1.  At the August 19 hearing, Mr. Wolf testified that he intends to appeal the Oklahoma Court of Appeals ruling rather than to pay Mr. Silverstein the amount of the Tulsa judgment.

---

[2] On March 3, 2022, the Tulsa district court awarded Mr. Silverstein $493,725.91 in attorneys' fees, pre-judgment interest, and litigation costs.  Exhibit 2 at 3; Docket No. 238-2 at 3.

### B. Rapid Park Holdings

Mr. Wolf testified that he has been associated with Rapid Park for over forty years.  Rapid Park is a pass-through entity through which different corporate entities funnel money so that the money can then be distributed.  Rapid Park was co-owned by Mr. Wolf and his siblings.

### C. Transfer to Madison and Madison's Present Situation

Mr. Wolf testified that, in December 2022, he transferred his shares in Rapid Park to Madison.  Mr. Wolf testified that, before this transfer, he formed Madison. Madison is a Wyoming limited liability company ("LLC").  Exhibit 17 at 1; Docket No. 238-17 at 1.  Mr. Wolf testified that, at the time of the transfer, he controlled Madison. Attachments to the Madison operating agreement dated December 29, 2022 list Mr. Wolf as the sole member and manager.  Exhibit 17 at 34-35; Docket No. 238-17 at 34-35.[3]  One of those attachments reflects the transfer of Rapid Park stock to Madison. *See* Exhibit 17 at 35; Docket No. 238-17 at 35.  The attachment lists a transfer from Mr. Wolf to Madison of 2900 shares of Class A voting common stock of Rapid Park and 100 shares of Class B non-voting common stock of Rapid Park, valued at $35,239,331. Exhibit 17 at 35; Docket No. 238-17 at 35.

Under the Madison operating agreement, the manager "shall have full, exclusive, and complete discretion, power, and authority, subject in all cases to the other provisions of this Agreement and the requirements of applicable law to manage, control, administer, and operate the business and affairs of the Company."  Exhibit 17 at 15;

---

[3] Mr. Wolf represented at the hearing that he formed Madison a few months before the December 2022 transfer.  However, the signed Madison operating agreement is dated December 29, 2022.  *See* Exhibit 17 at 32; Docket No. 238-17 at 32.

Docket No. 238-17 at 15.  Included in this authority is the right to sell, transfer, or otherwise dispose of any assets held by the company, Exhibit 17 at 15-17; Docket No. 238-17 at 15-17, and to vote on any stocks or other securities held by the company. Exhibit 17 at 17; Docket No. 238-17 at 17.

After transferring the Rapid Park shares to Madison, Mr. Wolf, as manager of Madison, transferred 99% of the membership units of Madison to the Verity Charitable Fund ("Verity").  Exhibit 17 at 39; Docket No. 238-17 at 39; *see also* Exhibit C; Docket No. 241-3.  Mr. Wolf testified that he made this donation for estate planning purposes and tax benefits.

Mr. Wolf's financial advisor for both the transfer of stock to Madison and the transfer of units to Verity, Michael Gilburd, testified as to the structure of these transactions.  The donor donates 99% of the membership units in a limited liability company ("LLC") to a qualified charitable organization.  Exhibit F at 1; Docket No. 241-6 at 1.  The donor receives a tax deduction based on the value of the donation.  Exhibit F at 1; Docket No. 241-6 at 1.  The manager of the LLC, however, still retains a 1% ownership stake after the transaction and holds broad power over the LLC.  Exhibit F at 1; Docket No. 241-6 at 1.  The LLC manager has veto power over any actions proposed by the 99% owner.  *Id.*  Mr. Gilburd testified that the transfer to Verity involved only membership units in Madison, not the underlying Rapid Park stock held by Madison.

Mr. Wolf testified that he was the manager of Madison up until one month ago, when Nicholas Gott became the manager of Madison.  Mr. Wolf did not testify, however, that he has transferred his 1% share in Madison to Mr. Gott.  According to the Madison operating agreement, the manager is selected by a vote of the members, Exhibit 17 at

14; Docket No. 238-17 at 14, and the testimony of Mr. Gilburd was that a 1% shareholder would still have the controlling vote.  Thus, there is no evidence that Mr. Wolf does not retain control over the selection of the manager, even if he is not presently the manager.  Mr. Wolf was asked at the hearing whether he knew of any plans to transfer the Rapid Park stock out of Madison.  He said no.  He also said that a transfer of the stock would cause tax problems for him.

### D.  Other Litigation

Mr. Silverstein and Mr. Wolf both testified that they are presently engaged in litigation in New York and Delaware courts regarding Mr. Silverstein's efforts to collect the Oklahoma judgment from Mr. Wolf.  Mr. Silverstein testified that the reason for inactivity in this case between Mr. Silverstein's 2023 and 2024 motions for injunctive relief was that he was engaged in collection efforts in other forums.  According to Mr. Silverstein, Mr. Wolf has taken conflicting positions across different litigation forums.  For example, Mr. Wolf has argued in New York, in a case filed against his siblings to receive proceeds of his Rapid Park stock, that he needs to obtain such proceeds so he can pay the judgment he owes to Mr. Silverstein.  Yet Mr. Wolf has continued to contest, both before this Court and in Oklahoma, whether he owes Mr. Silverstein money.  According to the testimony of both Mr. Silverstein and Mr. Wolf, the litigation in New York has frozen any payment of distributions from the Rapid Park stock formerly held by Mr. Wolf.

### E.  Mr. Wolf's Financial Condition

In a December 9, 2023 response to a discovery request, Mr. Wolf represented that the only assets he personally owned were cuff links, a tie clip, gold collar stays, some cashmere sweaters, and a Swatch watch.  Exhibit 7 at 1-2; Docket No. 238-7 at

1-2.  In an email sent on July 8, 2020 to the judge presiding over the Tulsa case, Mr.

Wolf represented that he was not financially able to pay for an attorney.  Exhibit 10;

Docket No. 238-10.  At the hearing, Mr. Wolf testified that both of his prior statements

were true, and that the only assets he presently owns are the ones that he listed in the

discovery response in 2023.

### F.  Mr. Wolf's History of Asset Transfers

Mr. Silverstein, during his business dealings with Mr. Wolf, observed Mr. Wolf to

transfer assets among various corporate entities in order to avoid liability.

## III.  LEGAL STANDARD

Plaintiff's motion seeks relief under CUFTA, Colo. Rev. Stat. § 38-8-101, et seq.

Docket No. 181 at 8.  CUFTA provides remedies for creditors seeking relief under the

statute, including: "(I) An injunction against further disposition by the debtor or a

transferee, or both, of the asset transferred or of other property; (II) Appointment of a

receiver to take charge of the asset transferred or of other property of the transferee; or

(III) Any other relief the circumstances may require."  Colo. Rev. Stat. § 38-8-108(1)(d).

CUFTA also provides that a creditor may levy execution on the asset transferred or its

proceeds if the creditor has obtained a judgment on a claim against the debtor.  *Id.* at

§ 38-8-108(2).

To obtain a preliminary injunction under Rule 65 of the Federal Rules of Civil

Procedure,[4] the moving party must show (1) a likelihood of success on the merits; (2) a

---

[4] Section 108(1)(d) states that a creditor may obtain the enumerated remedies "in
accordance with the applicable rules of civil procedure."  Colo. Rev. Stat. § 38-8-
108(1)(d).  "Under the Erie doctrine, federal courts sitting in diversity apply state
substantive law and federal procedural law."  *Gasperini v. Ctr. for Humanities, Inc.*, 518
U.S. 415, 427 (1996); *Hill v. J.B. Hunt Transp., Inc.*, 815 F.3d 651, 667 (10th Cir. 2016)

likelihood that the movant will suffer irreparable harm in the absence of preliminary

relief; (3) that the balance of equities tips in the movant's favor; and (4) that the

injunction is in the public interest. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208

(10th Cir. 2009) (citing *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7,

20 (2008)); *see Little v. Jones*, 607 F.3d 1245, 1251 (10th Cir. 2010). "[B]ecause a

preliminary injunction is an extraordinary remedy, the right to relief must be clear and

unequivocal." *Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC*, 562 F.3d

1067, 1070 (10th Cir. 2009) (quoting *Greater Yellowstone Coalition v. Flowers*, 321 F.3d

1250, 1256 (10th Cir. 2003)) (internal quotation marks omitted). Granting such "drastic

relief," *United States ex rel. Citizen Band Potawatomi Indian Tribe of Oklahoma v.*

*Enter. Mgmt. Consultants, Inc.,* 883 F.2d 886, 888-89 (10th Cir. 1989), is the "exception

rather than the rule." *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984).

## IV.  INJUNCTION FACTORS

### A.  <u>Irreparable Harm</u>

"A showing of probable irreparable harm is the single most important prerequisite

for the issuance of a preliminary injunction, the moving party must first demonstrate that

such injury is likely before the other requirements' will be considered." *First W. Capital*

*Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017) (quoting *Dominion Video*

*Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004)).

"Demonstrating irreparable harm is 'not an easy burden to fulfill.'" *Id.*, 874 F.3d at 1141

(citation omitted). "[T]he movant must demonstrate a significant risk that he or she will

---

(same).  Accordingly, the applicable rules of civil procedure regarding injunctive relief
are the Federal Rules of Civil Procedure.

experience harm that cannot be compensated after the fact by money damages." *Id.*
(internal quotation and citation omitted).

Mr. Silverstein's alleged injury is, ultimately, a financial one, *see* Docket No. 125
at 1, 28 ¶ 1, and "[i]t is [ ] well settled that simple economic loss usually does not, in and
of itself, constitute irreparable harm; such losses are compensable by monetary
damages." *Heideman v. S. Salt Lake City, 348 F.3d* 1182, 1189 (10th Cir. 2003).
However, "[d]ifficulty in collecting a damage judgment may support a claim of
irreparable injury." *Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River
Power, Inc.*, 805 F.2d 351, 355 (10th Cir. 1986) (collecting cases). The Court finds that
Mr. Silverstein has encountered significant difficulties in attempting to collect the
Oklahoma judgment from Mr. Wolf and various entities Mr. Wolf has created. In
addition to litigation in this Court and in Oklahoma, Mr. Silverstein and Mr. Wolf are
engaged in litigation in state courts in New York and Delaware. At the hearing, Mr. Wolf
indicated that, even after losing his appeal before the Oklahoma Court of Appeals, he
did not intend to pay Mr. Silverstein and would instead continue to litigate the issue.

Mr. Wolf offers two arguments as to why Mr. Silverstein fails to demonstrate a
risk of irreparable harm. First, Mr. Wolf argues that the delay between Mr. Silverstein's
first motion for injunctive relief, filed in June 2023, and the second motion for injunctive
relief, filed in September 2024, undercuts Mr. Silverstein's claim that he faces any
imminent danger of a Rapid Park stock transfer. Mr. Silverstein explained that the delay
in this case was due to his efforts to collect on the judgment in the New York and
Delaware litigation. The Court agrees with Mr. Silverstein that there was no delay by

Mr. Silverstein in seeking relief that would undercut a finding of irreparable harm without injunctive relief.

Second, Mr. Wolf argues that, because there has not been a transfer of Rapid Park stock from Madison since Mr. Wolf transferred the Rapid Park stock to Madison in December 2022, it is unlikely that the stock will be transferred in the future. However, the Court finds that Mr. Wolf has a history of engaging in asset transfers in order to avoid liability. Mr. Wolf, by virtue of being able to select the manager of Madison, who in turn has control over the business, still has significant control over Madison. The recent and unexplained appointment of Mr. Gott as manager of Madison raises the prospect that a party, about whom virtually nothing is known, is now in a position to transfer the stock. The Court thus finds that there is a significant risk that the manager of Madison could transfer the shares in Rapid Park to another corporate entity, which would frustrate Mr. Silverstein's collection efforts. The Court therefore finds that Mr. Silverstein has sufficiently demonstrated that he faces irreparable harm in the absence of injunctive relief.

### B.  Likelihood of Success on the Merits

In order for the Court to grant a plaintiff's motion for a preliminary injunction, the plaintiff must demonstrate "a likelihood of success on the merits." *RoDa Drilling Co.*, 552 F.3d at 1208.

> The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing.

*Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (citing *Progress Development Corp. v. Mitchell*, 286 F.2d 222 (7th Cir. 1961)).

Mr. Silverstein's underlying complaint is based on allegations that Mr. Wolf and the other defendants engaged in various fraudulent transfers in violation of CUFTA. Docket No. 125 at 12, 17, 20, 23, 25-27. The motion for injunctive relief is premised on the claim that Mr. Wolf violated CUFTA when he transferred Rapid Park stock to Madison in December 2022. *See, e.g.*, Docket No. 181 at 10.

"CUFTA's purpose is to protect a debtor's estate from certain depletions that prejudice the debtor's unsecured creditors." *CB Richard Ellis, Inc. v. CLGP*, LLC, 251 P.3d 523, 529 (Colo. App. 2010) (citing *Leverage Leasing Co. v. Smith*, 143 P.3d 1164, 1167 (Colo. App. 2006)). "Under CUFTA, a 'creditor' is a 'person who has a claim,' and 'claim' means 'a right to payment, whether or not the right is reduced to judgment, liquidated, . . . contingent, . . . disputed, undisputed, legal, equitable, secured, or unsecured.'" *ND Mgmt. Servs., LLC v. Two G-Ventures, LLC*, 2020 WL 14045346, at *10 (Colo. App. Apr. 2, 2020) (quoting Colo. Rev. Stat. § 38-8-102(3), (5)). Under CUFTA, a "debtor" is a "person who is liable on a claim." *Id.* (quoting § 38-8-102(7)). In October 2020, the Tulsa court entered summary judgment in Mr. Silverstein's favor against Mr. Wolf on the issue of liability. Exhibit 1 at 1; Docket No. 238-1 at 1. In October 2021, the Tulsa jury awarded Mr. Silverstein damages. *Id.* at 2. Thus, under CUFTA, Mr. Silverstein was, at the time of the alleged transfer of Rapid Park stock in December 2022 from Mr. Wolf to Madison, a creditor with a claim against Mr. Wolf.

Mr. Silverstein specifically brings his claim pursuant to Sections 38-8-105(1)(a) and 38-8-105(1)(b) of CUFTA.  Docket No. 125 at 12, 17, 20, 23, 25-27.  Those provisions state that:

> (1) A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
>> (a) With actual intent to hinder, delay, or defraud any creditor of the debtor; or
>>
>> (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>>
>>> (I)    Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>>>
>>> (II)    Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Colo. Rev. Stat. § 38-8-105(1)(a)–(b).  Section 38-8-105(1)(a) requires that the defendant act "with actual intent to hinder, delay or defraud."  In analyzing such a claim, courts rely on "badges of fraud" since "the intent to hinder, delay, or defraud creditors is seldom susceptible of direct proof."  *See Schempp v. Lucre Mgmt. Grp., LLC*, 18 P.3d 762, 764 (Colo. App. 2000), *as modified on denial of reh'g* (July 20, 2000) ("*Schempp I*").  These badges of fraud are:

> (a) The transfer or obligation was to an insider;
>
> (b) The debtor retained possession or control of the property transferred after the transfer;
>
> (c) The transfer or obligation was disclosed or concealed;
>
> (d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(e) The transfer was of substantially all the debtor's assets;

(f) The debtor absconded;

(g) The debtor removed or concealed assets;

(h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(j) The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(k) The debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor.

Colo. Rev. Stat. § 38-8-105(2)(a)–(k).  "While a single badge of fraud may only create suspicion of fraud, several badges of fraud considered together may infer intent to defraud."  *Schempp I*, 18 P.3d 762 at 764.  The Court will discuss each of the badges that it finds relevant to this case.

### 1. Colo. Rev. Stat. § 38-8-105(2)(a): Transfer of the asset to an insider

Under CUFTA, the term "insider" includes relatives of the debtor or of general partners of the debtor, a partnership in which the debtor is a general partner, or a corporation in which the debtor is a director, officer, or person in control.  Colo. Rev. Stat. § 38-8-102(8)(a).  At the hearing, Mr. Wolf testified that he created and controlled Madison, and that he had control of Madison at the time that he transferred the Rapid Park stock to it.  The Court finds that a debtor's transfer of stock to a limited liability company that he controls fits the definition of a transfer to an "insider."  The Court therefore finds that Mr. Wolf transferred the stock to an insider, namely, Madison.

### 2. Colo. Rev. Stat. § 38-8-105(2)(b): Debtor retains possession or control of the asset post-transfer

Under this factor, a court considers whether the debtor retained some degree of possession or control over the transferred property.  *Schempp v. Lucre Management Group, LLC*, 75 P.3d 1157, 1162 (Colo. App. 2003) ("*Schempp II*").  According to the Madison operating agreement, the manager of Madison has significant control over Madison's affairs, including over decisions regarding securities held by Madison. Exhibit 17 at 15-17; Docket No. 238-17 at 15-17.  Mr. Wolf testified that, at the time of the December 2022 transfer, he was the sole member and manager of Madison.  Mr. Wolf further testified that he remained as manager of Madison after he transferred 99% of the units in Madison to Verity.  Thus, Mr. Wolf, pursuant to the terms of Madison's operating agreement, retained control over the Rapid Park stock after the transfer to Madison.  In addition, there is no evidence that Mr. Wolf does not still own 1% of Madison.

### 3. Colo. Rev. Stat. § 38-8-105(2)(c): Concealment of the transfer

Under this factor, a court considers whether the parties to the transfer disclosed the transfer or if they sought to conceal it.  Colo. Rev. Stat. § 38-8-105(2)(c).  Courts consider whether the parties agreed to keep the transaction from the public, whether they complied with any public recording requirements, and whether they revealed the transaction to trustees and creditors of the debtor.  *Schempp II*, 75 P.3d at 1162.  The Court finds that this factor weighs in favor of finding a fraudulent transfer.  While there is no evidence that the transaction had to be publicly reported, Mr. Wolf, who owed money to Mr. Silverstein, transferred $35 million worth of Rapid Park stock he owned to

Madison and did not disclose the transaction to Mr. Silverstein until May 2023 as part of
the Delaware litigation.  Exhibit 6 at 2; Docket No. 238-6 at 2.

### 4.  Colo Rev. Stat. § 38-8-105(2)(d): Lawsuit preceding the transfer

For this factor, a court considers whether a lawsuit, or the threat of a lawsuit,
preceded the transfer at issue.  Colo. Rev. Stat. § 38-8-105(2)(d).  At the time of the
transfer in December 2022, Mr. Wolf had already been sued – and lost – in the Tulsa
case and faced collection efforts in the District of Colorado.

Although at the hearing Mr. Wolf claimed not to remember the October 2021 jury
verdict, the Court finds Mr. Wolf's testimony on this point not be credible.  The Court
finds that a lawsuit preceded the transfer, and that Mr. Wolf was aware of the judgment
at the time of the December 2022 transfer.

### 5.  Colo. Rev. Stat. § 38-8-105(2)(e): Transfer is substantially all of the debtor's assets

For this factor, the Court considers whether Mr. Wolf transferred substantially all
of his assets in the transaction.  Colo. Rev. Stat. § 38-8-105(2)(e).  In December 2022,
Mr. Wolf transferred $35 million in Rapid Park stock that he owned to Madison.  In
December 2023, he claimed that all he owned was a few items of clothing and jewelry.
The Court therefore finds that, when Mr. Wolf transferred the Rapid Park stock to
Madison, he transferred substantially all of his assets.

### 6.  Colo. Rev. Stat. § 38-8-105(2)(h): Value of consideration received by the debtor was reasonably equivalent to the value of the asset transferred

For this factor, a court considers whether "[t]he value of the consideration
received by the debtor was reasonably equivalent to the value of the asset transferred
or the amount of the obligation incurred."  Colo. Rev. Stat. § 38-8-105(2)(h).  Under

CUFTA, the term "[r]easonably equivalent value . . . is not wholly synonymous with market value." *Schempp I*, 18 P.3d at 765.  The term includes both direct and indirect benefits to the transferor-debtor, even if the benefit does not increase the transferor's net worth. *Leverage Leasing Co. v. Smith*, 143 P.3d 1164, 1167 (Colo. App. 2006). Intangible, non-economic benefits do not, however, constitute reasonably equivalent value. *Fifth Third Bank v. Morales*, No. 16-cv-01302-CMA-STV, 2017 WL 6492108, at *4 (D. Colo. Dec. 19, 2017).  "Consideration having no utility from a creditor's viewpoint does not satisfy the statutory definition [of reasonably equivalent value]." *Id.* (quoting § 38–8–104, cmt. 2).  In considering the concept of value, a court must keep in mind the purpose of CUFTA, which is to protect the debtor estate from being depleted to the prejudice of the debtor's unsecured creditors. *Id.*

Mr. Wolf testified that he received value for the transaction in the form of estate planning benefits and tax deductions.  Mr. Wolf did not explain the nature of the estate planning benefits he obtained and did not indicate the extent to which any tax obligations he had were reduced.  Moreover, the evidence does not suggest that benefits that Mr. Wolf obtained would have any value to a creditor such as Mr. Silverstein.  The Court therefore finds that Mr. Wolf did not receive reasonably equivalent value for his transfer of Rapid Park stock to Madison.

The Court has found six "badges of fraud," which weigh in favor of a finding of "actual intent."  The Court finds that Mr. Silverstein has demonstrated a likelihood of success on the merits of his claim that Mr. Wolf violated CUFTA by making a transfer with "actual intent to hinder, delay, or defraud any creditor of the debtor."  *See* Colo.

Rev. Stat. § 38-8-105(1)(a); *see also Schempp I*, 18 P.3d 762 at 764 ("several badges of fraud considered together may infer intent to defraud").

Finally, the Court is unpersuaded by Mr. Wolf's argument that the transfer was not fraudulent because Mr. Wolf believed that the sale of the Tulsa condominiums would fully satisfy the judgment against him. First, the Court finds Mr. Wolf's testimony about this belief not to be credible, given the fact that, in the Oklahoma litigation, Mr. Wolf contested whether Mr. Silverstein should be paid at all after the sale of the condominiums. Second, even if Mr. Wolf did hold such a belief, his belief is irrelevant. Liability under CUFTA is premised on an assessment of the badges of fraud, not on Mr. Wolf's purported subjective beliefs. At the time of the transfer of Rapid Park stock, a judgment had been entered against Mr. Wolf. He had a legal duty to pay that judgment. He could have sold his Rapid Park stock in order to satisfy the judgment, but he chose instead to transfer that stock to Madison.

### C. Balance of Equities

The balance-of-equities analysis considers whether the threatened injury to the movant outweighs the injury the opposing party will suffer under the injunction. *Sierra Club, Inc. v. Bostick*, 539 F. App'x 885, 889 (10th Cir. 2013) (unpublished). Given that Mr. Wolf testified that he does not plan to transfer the Rapid Park stock out of Madison, and that it would actually be bad for him if the stock were to be transferred, the Court finds that Mr. Wolf would not suffer any prejudice were the assets to be enjoined. The Court meanwhile finds that Mr. Silverstein would benefit from the Rapid Park stock being frozen, without the risk of further transfers, until the resolution of this case. The Court therefore finds that the balance of equities weighs in favor of injunctive relief.

### D. **Public Interest**

The Court finds that the public interest weighs in favor of injunctive relief because "[i]t would be inequitable and against the public interest to allow [a defendant] to dissipate its assets."  *Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. Kozeny*, 115 F. Supp. 2d 1231, 1242 (D. Colo. 2000), *aff'd sub nom. Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Kozeny*, 19 F. App'x 815 (10th Cir. 2001) (unpublished).

The Court thus finds that Mr. Silverstein has shown all four factors and that such factors weigh in favor of injunctive relief.[5]

## V. RELIEF REQUESTED BY PLAINTIFF

Mr. Silverstein's motion requests three forms of relief.  First, he seeks an injunction enjoining Mr. Wolf and "any other party" from further transfer of the Rapid Park stock that Mr. Wolf transferred to Madison.  Docket No. 181 at 1.  As discussed above, the Court has found that all four factors weigh in favor of injunctive relief.  The Court will therefore enjoin Mr. Wolf, Madison, and any other party who has control over the Rapid Park stock that was transferred from Mr. Wolf to Madison, from transferring, selling, encumbering, or otherwise disposing of that stock.

Second, in addition to an injunction, Mr. Silverstein's motion requests that the Court levy execution on the proceeds of the Rapid Park stock.  Docket No. 181 at 12.  Mr. Silverstein did not cite, either in the motion or at the hearing, any authority in support of a levy of execution.  Moreover, the Court understands, based on testimony

---

[5] At the hearing, Mr. Wolf argued that the relief sought by plaintiff is a mandatory injunction and should thus be considered a disfavored remedy.  While it is true that, at the hearing, Mr. Silverstein asked the Court to appoint a receiver who could take the income from the Rapid Park stock and pay it to Mr. Silverstein, a request that the Court rejects, the motion itself requests only the remedies noted above.

from both Mr. Silverstein and Mr. Wolf, that rulings in the New York case have frozen

the proceeds from the Rapid Park stock at issue here.  As such, a levy of execution on

the proceeds of the stock would provide no relief to Mr. Silverstein.  For both of these

reasons, the Court will deny the portion of the motion that requests a levy of execution.

    In the alternative to the first two remedies, Mr. Silverstein asks the Court to

appoint a receiver over the stock.  *Id.*  A court may appoint a receiver "to take the

control, custody[,] or management of property . . . involved in litigation, to preserve the

property, and to receive the rents, issues[,] and profits thereof pending the ultimate

determination of such litigation."  *United States v. Solco I, LLC*, 962 F.3d 1244, 1246

(10th Cir. 2020) (citations omitted).  "When a district court creates a receivership, its

focus is to safeguard the assets, administer the property as suitable, and to assist the

district court in achieving a final, equitable distribution of the assets if necessary."  *Id.*

(quoting *S.E.C. v. Vescor Capital Corp.*, 599 F.3d 1189, 1194 (10th Cir. 2010)).  The

receiver is an officer of the court and has complete jurisdiction and control of the

property.  *Id.* (citations omitted).

    Although a state statute may provide for receivership as a remedy, as CUFTA

does, *see* Colo. Rev. Stat. § 38-8-108(1)(d)(II), a federal court's authority to appoint a

receiver comes from its inherent equitable powers.  *See Vescor Capital Corp.*, 599 F.3d

at 1194.  Federal law governs the appointment even in a case brought under diversity

jurisdiction.  *See Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314, 316

(8th Cir. 1993) (citing Fed. R. Civ. P. 66).

    A receivership is an "extraordinary" remedy, justified only in "extreme situations."

*Id.*  In cases involving fraud and the dissipation of assets through fraudulent transfers,

such a remedy is justified. *See Matter of McGaughey*, 24 F.3d at 907 ("The appointment of a receiver is an especially appropriate remedy in cases involving fraud and the possible dissipation of assets."); *Aviation Supply Corp.*, 999 F.2d 314, 316–17 (8th Cir. 1993); *Santibanez v. Wier McMahon & Co.*, 105 F.3d 234, 241 (5th Cir. 1997). The Court finds that, given Mr. Wolf's history of transferring assets to avoid judgment, the likely fraudulent nature of the stock transfer to Madison, and the possibility that the current manager of Madison could transfer the Rapid Park stock from Madison, the Court finds that the appointment of a receiver is justified.

Before placing assets into a receivership, a must have either personal jurisdiction over the person who owns the assets or in rem jurisdiction over the property itself. *See Penn Gen. Cas. Co. v. Pennsylvania ex rel. Schnader*, 294 U.S. 189, 195 (1935). The Court has personal jurisdiction over Madison, which owns or controls the Rapid Park stock. The Court also has personal jurisdiction over Mr. Wolf, who is a defendant in this case. The Court therefore finds that it has personal jurisdiction over the owners of the property to be placed into receivership.

Second, the property to be placed into receivership must be the subject of the underlying dispute. *Netsphere, Inc. v. Baron*, 703 F.3d 296, 310 (5th Cir. 2012); *Peterson v. Islamic Republic of Iran*, 563 F. Supp. 2d 268, 277 (D.D.C. 2008). Here, the Rapid Park stock to be placed into receivership is one of several assets that is the subject of the underlying complaint in this case. *See* Docket No. 125 at 17.

Third, the Court must consider all other potentially relevant factors weighing in favor of or against a receivership. *Canada Life Assur. Co. v. LaPeter*, 563 F.3d 837, 845 (9th Cir. 2009). There is no "precise formula for determining when a receiver may

be appointed," *Aviation Supply Corp.*, 999 F.2d at 316, and "no one factor is

dispositive."  *Canada Life Assur. Co.*, 563 F.3d at 845.  The factors considered by

courts include:

> (1) the existence of a valid claim by the moving party; (2) the probability that fraudulent conduct has occurred or will occur to frustrate the claim; (3) imminent danger that property will be lost, concealed, or diminished in value; (4) inadequacy of available legal remedies; (5) lack of a less drastic equitable remedy; and (6) the likelihood that appointment of a receiver will do more harm than good.

*Waag v. Hamm*, 10 F. Supp. 2d 1191, 1193 (D. Colo. 1998).  The Court finds that the

"existence of a valid claim by the moving party" factor is comparable to the injunction

analysis's "likelihood of success on the merits" factor.  The Court has already found that

Mr. Silverstein is likely to prevail on the merits of his CUFTA claim and, for the same

reasons, finds that Mr. Silverstein has a valid claim.

Second, the Court finds that there is an "imminent danger that property will be

lost, concealed, or diminished in value" and there is an "inadequacy of available legal

remedies."  The Court has already found that Mr. Silverstein faces irreparable harm

without the relief of an injunction and, for the same reasons, finds that Mr. Silverstein

faces an imminent danger of lost or diminished property that cannot be legally

remedied.

Third, the Court finds that there is no "likelihood that appointment of a receiver

will do more harm than good."  As noted earlier, the Court does not discern any

prejudice to Mr. Wolf.

As to probability of fraudulent conduct frustrating the claim and the lack of a less

drastic equitable remedy, the Court finds that Mr. Wolf has a history of fraudulent asset

transfers and that there is a probability of future fraudulent conduct that would frustrate

the claim.  Finally, the Court finds that no lesser equitable remedy would be sufficient.

Based on the evidence presented at the hearing, the Court finds that Mr. Silverstein has

shown that the circumstances surrounding the transfer of Rapid Park stock to Madison

are suspicious.  Further, the Court has concerns about the current status of the stock,

given the recent appointment of a new manager who can, by the terms of the Madison

operating agreement, control the disposition of the Rapid Park stock.  The potential

exists, with the change in managers from Mr. Wolf, who is a party to this case and

subject to this Court's jurisdiction, to Mr. Gott, about whom nothing is known, that there

could be future attempts to transfer or dissipate the value of the Rapid Park stock.  The

Court therefore finds that merely enjoining Mr. Wolf and Madison from transferring the

stock would be an insufficient remedy and that appointing a receiver is necessary.

Having found that the Court has jurisdiction to appoint a receiver over the Rapid

Park stock and that numerous factors weigh in favor of the appointment of a receiver,

the Court will appoint a receiver to take control of the stock.  In the interim period

between this order and the appointment of a receiver, the Court will enjoin the

defendants, including Mr. Wolf and Madison, and any other party who has control over

the Rapid Park stock, from transferring, selling, or otherwise disposing of the Rapid

Park stock.

## VI.  BOND

Federal Rule of Civil Procedure Rule 65(c) provides that a court "may issue a

preliminary injunction or a temporary restraining order only if the movant gives security

in an amount that the court considers proper to pay the costs and damages sustained

by any party found to have been wrongfully enjoined or restrained."  The trial court has

"wide discretion" in setting the amount of the preliminary injunction bond.  *Dominion*

*Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1158 (10th Cir. 2001). The Court will set the bond at $10,000. As noted earlier, the proceeds of the Rapid Park stock are frozen and Mr. Wolf has not shown any harm to him or to Madison from the appointment of a receiver. This bond will continue to be held in the Court registry after the appointment of the receiver and until the final disposition of this case. The Court will order Mr. Silverstein to post the bond by August 26, 2025. The preliminary injunction will go into immediate effect; posting of the bond is not a prerequisite to this order taking effect. The failure to post a bond by August 26 will not automatically void the injunction but shall subject Mr. Silverstein to an order to show cause why the injunction should not be dissolved.

## VII.  IDENTITY OF RECEIVER

On or before August 28, 2025, Mr. Silverstein and Mr. Wolf shall each propose three names to serve as the receiver in this case. The filings shall include a summary of the qualifications of each person, as well as the fees he or she would charge. On or before September 2, 2025, Mr. Silverstein and Mr. Wolf may each file, in a pleading not to exceed five pages, any objections they may have to the proposed receivers.

## VIII.  CONCLUSION

It is therefore

**ORDERED** that plaintiff's Motion to Enjoin Transfers of Stock, to Levy Execution of Proceeds of Stock, and for Appointment of Receiver over Stock [Docket No. 181] is **GRANTED in part and DENIED in part**. It is further

**ORDERED** that the defendants, including Jeffrey Wolf, Madison Family Enterprises, their officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with the persons listed here, are

23

hereby enjoined from transferring, selling, encumbering, or otherwise disposing of the shares of Rapid Park stock that were owned by Mr. Wolf and then transferred to Madison Family Enterprises.  It is further

  **ORDERED** that, on or before **August 28, 2025**, plaintiff Steven Silverstein and defendant Jeffrey Wolf shall each propose three names of persons to serve as a receiver.  It is further

  **ORDERED** that, on or before **September 2, 2025**, plaintiff Steven Silverstein and defendant Jeffrey Wolf may file any objections to the receiver candidates proposed by the opposing party.  It is further

  **ORDERED** that, on or before **August 26, 2025**, plaintiff Steven Silverstein shall deposit a bond of $10,000 into the registry kept by the Clerk of the Court.

  DATED August 21, 2025.

      BY THE COURT:

      PHILIP A. BRIMMER
      Chief United States District Judge